**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

CYNTHIA OSBORNE,                        §
                    Plaintiff,          §
                                        §
vs.                                     §          CIVIL ACTION NO. H-06-3128
                                        §
MICHAEL J. ASTRUE,                      §
COMMISSIONER OF SOCIAL                  §
SECURITY,                               §
                    Defendant.          §

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry #7).  Cross-motions for summary judgment have been filed by Plaintiff Cynthia Osborne ("Plaintiff," "Osborne") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #16; Commissioner's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #17).  Each party has also filed a response to the competing motions. (Plaintiff's Response, Docket Entry #22; Defendant's Response, Docket Entry #18).   After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's Motion be GRANTED, that Defendant's Motion be DENIED, and that the case be remanded for further consideration.

**Background**

On March 12, 2002, Plaintiff Cynthia Osborne filed applications for both Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and for

Supplemental Security Income ("SSI"), under Title XVI of the Act.[1]  (Transcript ["Tr."] at 22, 412).

In her applications, Plaintiff claimed that she had been unable to work since June 1, 2001, as a result

of "rheumatoid arthritis, fibromyalgia, depression, carpal tunnel, rotten lymph nodes[,] . . . severe

joint pain, exhaustion, migraines, fever, body aches, and lack of sleep." (Tr. at 78).  The SSA denied

Plaintiff's application on January 15, 2003, finding that she is not disabled under the Act.  (Tr. at

30-35, 415).  Plaintiff petitioned for a reconsideration of that decision.  (Tr. at 36).  The SSA then

had her case independently reviewed, but again denied her benefits, on August 4, 2003.  (Tr. at 37-

38, 416-18).

On September 24, 2003, Plaintiff requested a hearing before an administrative law judge

("ALJ").  (Tr. at 40).  That hearing, before ALJ Lantz McClain, took place on February 3, 2005.

(Tr. at 22).  Plaintiff appeared with her attorney, Donald Dewberry ("Mr. Dewberry"), and she

testified in her own behalf.  (*Id.*).  The ALJ also heard testimony from Herman Litt ("Mr. Litt"), a

vocational expert witness.  (*Id.*).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to

determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact,

disabled:

> 1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).
>
> 2.  An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

---

[1] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that he is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Osborne has the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).   Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.   A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Osborne has "depression, post traumatic stress disorder, costochrondal[2] pain, carpal tunnel syndrome, a history of migraine headaches, rheumatoid arthritis, and gastro intestinal problems," and that those impairments are "severe."  (Tr. at 28).   He also found that she had a "history of hemorrhoids, history of a kidney cyst, laporoscopy, history of hysterectomy, and side effects from her medications," but that these "do not result in a 'severe' impairment."  (*Id*.).   He decided that none of these impairments meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.  (*Id*.).   Next, the ALJ found that Osborne was unable to perform her past relevant work as an office manager, quality assurance engineer and

---

[2] The word "costochrondal" refers to "a rib and its cartilage." MOSBY'S MEDICAL, NURSING, & ALLIED HEATH DICTIONARY 408 (5th ed. 1998).

lead person, escrow officer, and carpet cleaner.  (Tr. at 26, 28).  However, he determined that she does have "the residual functional capacity to perform a significant range of light work," including work as an office helper.  (Tr. at 28).  He concluded that Osborne "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision."  (*Id.*).

On April 6, 2005, Plaintiff requested an Appeals Council review of the ALJ's decision.  (Tr. at 18).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On August 2, 2006, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed.  (Tr. at 7).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On October 3, 2006, Osborne filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Complaint ["Complaint"], Docket Entry #1).  Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Plaintiff's motion for summary judgment be granted, and that Defendant's motion be denied.  Further, it is recommended that the SSA's final decision on Osborne's impairments be reversed and that this case be remanded, with instructions to the ALJ to give due consideration to Plaintiff's physical and mental impairments and to the opinions of her treating physicians.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's finding on a number of grounds. First, she argues that the ALJ erred because he failed to give proper consideration to her fibromyalgia. (Plaintiff's Motion at 4). Next, she claims that the ALJ failed to properly evaluate her mental

impairments.  (*Id.*).  Osborne also claims that the ALJ failed to properly evaluate the opinions of her treating physicians.  (*Id.*).  In addition, she complains that the ALJ failed to properly evaluate her credibility.  (*Id.*).  Osborne also argues that the ALJ erred when he determined that her impairments did not meet or equal the requirements of listing 1.04.  (*Id.*).  She further argues that the ALJ erred in making his assessment of her residual functional capacity ("RFC").  (*Id.* at 5).  As to this final point, she claims, specifically, that the ALJ erred because he found that she retained the ability to perform other work that exists in the national economy.  (*Id.*).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Response at 10).

### Medical Facts, Opinions, and Diagnoses

The earliest medical record shows that Osborne was treated by Dr. David Mobley ("Dr. Mobley"), a urologist, in November 1998.  (Tr. at 370-78).   On November 23, 1998, Dr. Mobley, or a physician on his behalf, performed a cytsoscopy and hydrodilation of Osborne's bladder because she was suspected to have interstitial cystitis and an overdistension of her bladder.  (Tr. at 370-78).  Dr. Mobley's post-operative diagnosis was "chronic cystitis with minimal evidence of interstitial cystitis."  (Tr. at 374).  On March 11, 2004, Dr. Mobley saw her again and diagnosed her as suffering from bladder problems and interstitial cystitis.  (Tr. at 352-56).

The next records, dated April 22, 1999, show that Osborne was treated by Dr. Dennis Payne ("Dr. Payne"), a rheumatologist.  (Tr. at 130). At that appointment, Dr. Payne examined her, reviewed her past medical records, and diagnosed her as suffering from "[a]rthralgias and myalgias."[3]  (Tr. at 131).  He also noted that Osborne has had "multiple markedly abnormal

---

[3] These terms refer to joint and muscle pain, respectively.  *See id.* at 126, 1065.

laboratory tests in the past without clear objective findings to support the abnormalities." (*Id*.). He concluded that her condition was "most consistent with a fibromyalgia[4] type process" and that it should be treated with anti-inflammatory medications and tender point injections. (*Id*.).

Medical records from New River Behavioral Health Care document individual therapy sessions that Osborne had with Suzanne Biggs ("Ms. Biggs"), a social worker, in May and June, 1999. (Tr. at 133-34). These records reveal that Osborne has a past history of sexual abuse and that she had "been victimized or harassed sexually by many males in her life." (Tr. at 133). Ms. Biggs found that Osborne suffered from major depression, as well as from possible post traumatic stress disorder ("PTSD") and an anxiety disorder. (Tr. at 134). She recommended a course of therapy, including writing exercises to deal with Plaintiff's grief. (Tr. at 133).

On June 8, 2000, Osborne visited the emergency room at Cannon Memorial Hospital. (Tr. at 135-40). According to the record, Osborne presented with complaints of chest pain and shortness of breath. (Tr. at 140). An x-ray of her chest proved negative for abnormalities. (Tr. at 139). She was discharged that day with a diagnosis of hypoglycemia and depression. (Tr. at 135).

On March 14, 2001, Osborne saw Dr. William Tate ("Dr. Tate"), a surgeon, regarding a possible surgery to remove a diseased gallbladder. (Tr. at 141-42). She was referred to Dr. Tate by Dr. Charles Baker ("Dr. Baker"), an internist. (Tr. at 141). After examining her, Dr. Tate diagnosed Osborne as suffering from chronic inflammation of the gallbladder and from fibromyalgia. (Tr. at 142). Dr. Tate explained to Osborne "that these symptoms may or may not be related to gallbladder disease." (Tr. at 142). However, he also told Plaintiff that removing her gallbladder had a 75 to

---

[4]"Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance." *Id*. at 632. "Common sites of pain or stiffness can be palpated in the lower back, neck, shoulder region, arms, hands, knees, hips, thighs, legs, and feet." *Id*.

85% chance of relieving some of her symptoms, even though it would not eliminate the pain that was due to fibromyalgia.  (*Id*.).  Osborne consented to the surgery, which Dr. Tate performed on March 27, 2001.  (Tr. at 142-53).  On a follow-up visit on April 11, 2001, Dr. Tate found that the surgery site appeared to be healing well, but that Osborne complained of severe pain in the lower abdominal incision.  (Tr. at 154-55).  Dr. Tate prescribed pain medication and instructed her to massage the area regularly and to "move around as much as she can."  (Tr. at 154).

The transcript contains records covering the period from October 17, 2001, through January 21, 2002, from the Clear Lake Medical Center.  (Tr. at 174-86).  Blood tests performed on October 23, 2001, found Osborne's triglyceride, total cholesterol, and glucose levels to be abnormal.  (Tr. at 183).  A CAT scan of Osborne's abdomen and pelvis, performed on January 21, 2002, revealed a "[s]ingle, small, probable left renal cyst" and "[b]ilateral inguinal adenopathy.[5]"  (Tr. at 175). Toward the end of this period, on orders of her gynecologist, Dr. Beth Files ("Dr. Files"), found that Osborne was suffering from sexually transmitted diseases which were causing some of her pain and sleep disturbance.  (Tr. at 178, 180, 188-204).

Between October 17, 2001, and April 14, 2003, Osborne attended at least fourteen psychotherapy sessions with Ansley Kilgore ("Ms. Kilgore"), a social worker.  (Tr. at 158-64).  At their first appointment, Osborne complained of nausea, headaches, "body-bone aches," exhaustion, and "ongoing cold/flu."  (Tr. at 158).  In a letter to the state disability determination office, dated April 14, 2003, Ms. Kilgore stated that,

> [Osborne's] presenting complaints included the following:  moderate to severe symptoms of anxiety; poor sleep; many physical problems x 5 years resulting in chronic pain; low self esteem; trauma (sexual abuse) for many years during her

---

[5] The words "inguinal adenopathy" suggest glandular enlargement.  *See id.* at 38, 839.

9

childhood and early teen years + issue in this area remain unresolved; inability to maintain employment for past several years due to anxiety/chronic pain/and difficulty functioning/ and depression (no suicidal ideation on intake 1-13-03). During the course of treatment, her symptoms of anxiety + depression intensified and she became suicidal resulting in her going to Park [R]idge Hospital psychiatric [inpatient] unit for a brief period (2-14-03; 2-15-03).  Following her discharge, she has only had passive thoughts of suicide. . . .  In addition to her treatment with me, she is seen by her family doctor, Dr. C. Baker and Dr. Phylis Allwell, psychiatrist.

(Tr. at 162-63).  Ms. Kilgore examined Osborne's mental state and found her to be "salient", oriented in all three spheres, and of above average intelligence.  She also found, however, that Plaintiff suffered from moderate to severe anxiety, depression, low self-esteem, and chronic pain. (Tr. at 163).  She gave Osborne a diagnosis of PTSD and recommended that she continue psychotherapy.  (*Id*.).  Ms. Kilgore concluded that Osborne is "unable to maintain employment." (*Id*.).

Over the same period, Osborne sought treatment at the Allergy, Asthma and Arthritis Pain Clinic.  (Tr. at 211-43).  On October 17, 2001, Osborne saw Dr. Arun Sharma ("Dr. Sharma"), a rheumatologist and pain management specialist, complaining of pain in her lower back, both shoulders, neck, hips, and knees.  (Tr. at 243).  Dr. Sharma examined Plaintiff, determined that she should rule out rheumatoid arthritis, and observed that Osborne suffered from fibromyalgia and bursitis.  (*Id*.).  On a regular basis, from that date forward, Dr. Sharma examined Osborne and gave her injections designed to help relieve her symptoms.  (Tr. at 211-43).  She also prescribed medications for additional pain relief.  (*Id*.).  On June 18, 2002, Dr. Sharma wrote a letter to the Texas Rehabilitation Commission informing it that Osborne suffered from fibromyalgia, RA

negative arthritis,[6] tendinitis, and bursitis.  (Tr. at 244).  In that letter, she also made the following statement:

> Because of severity of her arthritis and chronic exacerbation of her pain symptoms she was started on intra-articular facet joint nerve block injections to minimize functional and physical impairment.  Ms. Cynthia Osborne is disabled, unable to work or hold gainful employment.

(*Id.*).

From November 15, 2001, to December 21, 2001, Osborne attended a church outreach program called Shalom Ministries for Healing and Wholeness.  (Tr. at 165-73).  Those records appear to be documentation of Osborne's physical and emotional complaints.  Some things that Osborne disclosed during that period include the following: she feels that she suffers from obsessive compulsive disorder and that she is schizophrenic; she has felt suicidal in the past; her husband is an alcoholic; she was sexually abused by her mother's former husbands since age 5; and her husband sexually abuses her when he is drunk.  (Tr. at 165-68).  Osborne also described a difficult family life and voiced concern for the welfare of her eleven-year-old son.  (Tr. at 169, 173).  Osborne described her gallbladder operation as "a nightmare," because she developed serious complications in the form of her "bladder shut[ting] down," which required her return to the hospital by ambulance.  (Tr. at 172).

The next medical records detail Osborne's treatment at Christus St. John Hospital from July 22, 2002, through July 27, 2002.  (Tr. at 247-70, 357-69).  According to these records, Osborne was hospitalized from July 22, 2002, through July 23, 2002, due to a bladder infection.  (Tr. at 357-69).  While there, she was examined by Dr. John Handley ("Dr. Handley"), an internist; Dr. Niranjan

---

[6] It is well accepted that negative rheumatoid arthritis factor results, alone, do not exclude the possibility of rheumatoid arthritis.  *See Gutzman v. Apfel,* 109 F. Supp. 2d 1129, 1131 n.2 (D. Neb. 2000); *ABC of Rheumatology* 54 (3d ed. 2004); Vol. 8A, 270 *Proving Medical Diagnosis and Prognosis* § 270.02 (Ravel 1995).

Ganesan Iyer ("Dr. Iyer"), a pulmonologist; Dr. Hussein Ahmad ("Dr. Ahmad"), an infectious disease specialist; and Dr. Kelly Steven Oggero ("Dr. Oggero"), a surgeon. (*Id*.). Osborne underwent a series of tests during her stay. An x-ray of Osborne's chest showed evidence of pneumonia. (Tr. at 357). A CT scan of her abdomen showed "bilateral pleural pyelonephritis[7] of the left kidney without complications," and she was found to have "bilateral pleural effusion."[8] (*Id*.). A urine culture revealed that Plaintiff had e. coli. (Tr. at 358). Dr. Ahmad noted that he was already familiar with Osborne because he had evaluated her six months earlier for a lymphadenopathy.[9] (Tr. at 365). On July 23, 2002, Osborne was discharged from the hospital with the following diagnoses: acute pyelonephritis;[10] pleural effusion; e. coli; hypokalemia;[11] rheumatoid arthritis; and fibromyalgia. (Tr. at 357). The hospital records show that Osborne returned to the hospital on the same day, however, complaining of severe nausea and vomiting with abdominal pain. (Tr. at 267). She was again admitted, and Dr. Oggero ordered a series of tests to determine the cause, which he suspected might be a perforated viscus.[12] (Tr. at 267-70). CAT scans of Osborne's abdomen revealed "bilateral pleural effusions with discoid atelectasis[13] in both lung bases"; a severe

---

[7] "Pyelonephritis" is a type of kidney infection. *See* MOSBY'S at 1362-63.

[8] "Pleural effusion" is "an abnormal accumulation of fluid in the [membrane structure] of the lungs." *Id*. at 1277.

[9] A "lymphadenopathy" is "any disorder characterized by a localized or generalized enlargement of the lymph nodes or lymph vessels." *Id*. at 966.

[10] "Acute pyelonephritis" is "the result of an infection that ascends from the lower urinary tract to the kidney." *Id*. at 1363. E. coli is a common cause. *See id*.

[11] "Hypokalemia" refers to an inadequate level of potassium in the bloodstream. *See id*. at 800.

[12] The words "perforated viscus" suggest a tear in the "internal organs in the abdominal cavity." *Id*. at 1714-15.

[13] "Atelectasis" is "an abnormal condition characterized by the collapse of the alveoli, preventing the respiratory exchange of carbon dioxide and oxygen." *Id*. at 141.

kidney infection; and a "markedly distended bladder."  (Tr. at 267).  On the following day, an x-ray of Osborne's chest revealed that her "heart size is borderline to mildly enlarged" and that she has "[s]mall bilateral effusions and infiltrate left lower lobe," which were indicative of pneumonia.  (Tr. at 266).  A later chest x-ray showed "[w]orsening bibasilar infiltrates and effusions consistent with pneumonia greatest on the left."  (Tr. at 263).  Further, a lung scan revealed small perfusion abnormalities and a "[l]ow probability of recent significant pulmonary embolus."[14]  (Tr. at 265).

On September 25, 2002, Dr. Alex Riddle ("Dr. Riddle"), a psychologist, conducted a psychological evaluation of Osborne on behalf of the state.  (Tr. at 271-73).  During that examination, Dr. Riddle noted that Osborne "appeared to be a reliable source."  (Tr. at 271).  Following the examination, Dr. Riddle diagnosed Osborne as suffering from a mood disorder with depressive features, as a result of her fibromyalgia, and stated that she "is currently functioning in the Low Average range of intelligence with commensurate insight."  (Tr. at 273).  He concluded as follows:

> Socially and emotionally, it is believed that the claimant could satisfactorily adjust to a work environment and schedule and relate well to co-workers.  Intellectually and cognitively, it is believed that she could satisfactorily complete work-related tasks.  If awarded benefits, it does not appear as though she would need a payee.

(*Id.*).

On November 12, 2002, Osborne was examined by Dr. David Cline ("Dr. Cline"), a specialist in family medicine, on behalf of the state.  (Tr. at 274-79).  Dr. Cline diagnosed Osborne as suffering from fibromyalgia, rheumatoid arthritis, and carpal tunnel syndrome.  (Tr. at 278).  He then found that Osborne had no difficulty walking or reaching, and only a slight decrease in a

---

[14] A "pulmonary embolus" is a foreign matter blocking a pulmonary artery.  *See id.* at 1355.

normal ability to squat or grasp.  (Tr. at 275).  He estimated that Plaintiff could  regularly lift or carry objects weighing up to ten pounds.  (*Id*.).

On January 14, 2003, Dr. Chrystal Dolby ("Dr. Dolby") performed a physical RFC assessment of Plaintiff on behalf of the state.  (Tr. at 280-87).  In that assessment, Dr. Dolby determined that Osborne could lift and carry objects weighing up to 50 pounds occasionally and 25 pounds frequently; that she could sit, stand, or walk for six hours in an 8-hour workday; and that she was unlimited in her ability to push and pull, bearing in mind the weight limitations noted.  (Tr. at 281).  Dr. Dolby also found that Osborne could climb and balance occasionally, but that her ability to finger objects was limited.  (Tr. at 282).  She did, however, diagnose Osborne as suffering from fibromyalgia, rheumatoid arthritis, and carpal tunnel syndrome, and made note of the following:

> [Osborne] has a hard time opening things and she tires easily.  Her muscles and joints have constant pain.  Due to her [carpal tunnel syndrome], she has tremendous pain in arms and hands.

(Tr. at 287).

On January 15, 2003, Dr. Giuliana Gage ("Dr. Gage"), a psychiatrist, made a mental RFC assessment and completed a psychiatric review technique form ("PRTF") on behalf of the state.  (Tr. at 288-301, 302-05).  In the RFC assessment, Dr. Gage found that Osborne was "not significantly limited" in many tasks, and was only "moderately limited" in the following areas:  "ability to understand and remember detailed instructions"; "ability to carry out detailed instructions"; "ability to maintain attention and concentration for extended periods"; "ability to complete a normal workday and workweek"; "ability to interact appropriately with the general public"; "ability to accept instructions and respond appropriately to criticism"; "ability to respond appropriately to changes in the work setting"; and "ability to set realistic goals or make plans independently of

14

others." (Tr. at 302-03). Based on these findings, Dr. Gage concluded that Osborne would have to be employed in work that did not require detailed memory and understanding, that did not involve production work, and that took place in a non-public and low-stress setting. (Tr. at 304). Dr. Gage diagnosed Osborne as suffering from a mood disorder, and, on the PRTF, she considered the SSA listings for affective disorders and somatoform disorders. (Tr. at 288, 305). As to affective disorders, which are detailed in Listing 12.04, Dr. Gage found that Osborne had a medically determinable impairment—a "mood disorder due to fibromyalgia"—but that it did not satisfy the listing criteria. (Tr. at 291). Dr. Gage also found that Osborne's condition did not satisfy the criteria for a somatoform disorder as defined in Listing 12.07. (Tr. at 294).

The next relevant medical records are data from Osborne's hospitalization, on February 14, 2003, at Park Ridge Hospital for symptoms of depression, anxiety, and suicidal thoughts. (Tr. at 306-32). Plaintiff had reportedly acquired a gun and planned to shoot herself, but her husband took the gun away. (Tr. at 315). There is a notation in these records that Plaintiff had attempted suicide in the past by an overdose of medicine and by slitting her wrists. (Tr. at 316). Osborne was admitted to the hospital because she was considered to be an immediate threat to herself. (Tr. at 319). While hospitalized, Osborne was treated by Dr. Stephen Buie ("Dr. Buie"), a psychiatrist. (*Id.*). On her discharge, Dr. Buie diagnosed Osborne as suffering from "recur[ring] depression psych[iatric]-severe," prolonged PTSD, rheumatoid arthritis or fibromyalgia, and migraine headaches, as well as social stressors such as marital discord and financial problems. (Tr. at 306,

309, 314).  Dr. Buie gave Osborne a Global Assessment of Functioning ("GAF") score of 50.[15]  (Tr. at 309).

The next record is a brief summary from Dr. Baker, covering treatment from December 23, 2002, through April 2, 2003, for back and neck pain; lower thoracic pain; fibromyalgia with costochronral pain; and arthritis.  (Tr. at 334).  In that summary, Dr. Baker also notes Plaintiff's anxiety and depression, with occasional suicidal ideation.  (*Id.*).

From March 3, 2003, through October 29, 2003, Osborne was treated by Dr. Phyllis Atwell ("Dr. Atwell"), also a psychiatrist, for mild obsessive compulsive disorder; "major depression, recurrent, severe"; a history of suicide attempts; anxiety; PTSD; and  sleeping and eating disorders. (Tr. at 335-42,  439-46, 447-56).  According to these records, on April 1, 2003, Osborne informed Dr. Atwell that she had "w[o]ken up this morning feeling bad"; had experienced an anxiety attack; and had developed a headache, blurred vision, and a fever.  (Tr. at 450).  In addition, Plaintiff reported that she had experienced hallucinations such as "talking to people who were not there." (*Id.*).  On October 29, 2003, Dr. Atwell made a notation that Osborne might also suffer from attention deficit disorder.  (Tr. at 448).  Dr. Atwell rated Plaintiff's GAF at 40.[16]  (Tr. at 341). Throughout these records, Dr. Atwell noted that Osborne had been treated previously for many of these conditions with a number of medications, with varying success.  (*See* Tr. at 335-42,  447-56).

---

[15] The GAF scale is used to rate "overall psychological functioning on a scale of 1-100," with 100 representing "superior functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).  A GAF of 41-50 may indicate the presence of serious mental disturbances, or of moderate social or occupational difficulties, including an inability to retain a job.  *See id.*

[16] A GAF of 31-40 is considered to be "extremely low," and "indicates [s]ome impairment in reality testing or communication  . . . [or] major impairment in reality testing or communication  . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*

She recommended that Plaintiff continue on a medication regimen, with treatment from Dr. Baker, and with psychotherapy from Ms. Kilgore. (Tr. at 342).

On July 30, 2003, a second physical RFC was performed on the state's behalf.[17] (Tr. at 343-50). In the assessment, the physician noted that Osborne could lift or carry 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for six hours in an eight-hour workday; and was not limited in her ability to push or pull except for the above weight limitations. (Tr. at 344). He or she also found that Osborne had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 345-47). However, the physician noted that there was no statement from a treating or examining source to aid in the evaluation. (Tr. at 349).

The next medical record shows that, from February 16, 2004, through July 19, 2004, Osborne was treated by Dr. Alfredo Ermac ("Dr. Ermac"), a family practitioner. (Tr. at 398-406). Unfortunately, many of Dr. Ermac's notes are difficult to decipher. It is clear, however, that at least a portion of his treatment involved complaints of rheumatoid arthritis; carpal, elbow, abdominal, back, and sciatic nerve pain; urinary tract and bladder infections; rectal bleeding; migraine headaches; and fatigue. (Tr. at 399, 400, 406). Also, during this period, on April 19, 2004, Osborne was admitted to Memorial City Hospital complaining of abdominal pain and rectal bleeding. (Tr. at 379-96). An x-ray of her abdomen and pelvis showed a small bowel obstruction or perforation and a left renal cyst. (Tr. at 382). She was discharged on April 20, 2004, with a diagnosis of hemorrhoids and "rectal bleeding-resolved." (Tr. at 381, 389).

On January 31, 2005, Osborne was treated by Dr. Daniela White ("Dr. White"), a psychiatrist, for depression, PTSD, and anxiety. (Tr. at 408-11). Dr. White described Osborne's

---

[17] The record is signed "ABC," and does not otherwise indicate who performed the evaluation.

appearance at the appointment as sad and tearful.  (Tr. at 411).  Dr. White recommended a continuing regimen of medication and psychotherapy.  (*Id.*).

On February 14, 2005, at the request of Plaintiff's attorney, Dr. Atwell made an RFC assessment of Osborne's mental state.  (Tr. at 439-46).  In her assessment, Dr. Atwell found that, on average, Osborne's mental impairments would cause her to be absent more than three says a month.  (Tr. at 442).  She also determined that Osborne had only a "fair" mental ability and aptitude to perform the following requirements of unskilled work:  "understand and remember very short and simple instructions"; "carry out very short and simple instructions"; "maintain attention for two hour segments"; "sustain an ordinary routine without special supervision"; "work in coordination with or proximity to others without being unduly distracted"; "respond appropriately to changes in a routine work setting"; "set realistic goals and make plans independently of others"; "travel in unfamiliar places"; and "use public transportation." (Tr. at 443-45).  She further found that Osborne had  "poor" to no mental ability and aptitude to perform the following requirements of unskilled work:  "maintain regular attendance and be punctual within customary, usually strict tolerances"; "complete a normal workday and workweek without interruptions from psychologically based symptoms"; "perform at a consistent pace without an unreasonable number and length of rest periods"; and "deal with stress of semiskilled and skilled work."  (Tr. at 443-44).  Dr. Atwell also stated that Osborne was "often" limited her in "concentration, persistence or pace" resulting in a failure to complete tasks in a timely manner.  (Tr. at 445).  Finally, Dr. Atwell found that Plaintiff had experienced "repeated (three or more) episodes" of "deterioration or decompensation in work or work-like settings."  (*Id.*).

18

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Osborne was 33 years of age, and had a high school equivalent education (GED).  (Tr. at 23, 462).  At the hearing, Osborne testified that her work history included jobs as an office manager, a quality assurance engineer, and an escrow officer.  (Tr. at 466-69). There is also evidence that she once held a position as a carpet cleaner.  (Tr. at 481).

### *Subjective Complaints*

In her applications for benefits, Plaintiff claimed that she has been unable to work since June 1, 2001, as a result of the following conditions:

> rheumatoid arthritis, fibromyalgia, depression, carpal tunnel, rotten lymph nodes[,]
> . . . severe joint pain, exhaustion, migraines, fever, body aches, and lack of sleep.

(Tr. at 78).  In more general terms, she explained that she regularly suffers from pain in her neck, head, shoulders, ribs, elbows, wrists, fingers, lower back, hips, and muscles, generally, as well as from depression.  (Tr. at 54, 56).  She reported that her pain generally lasts "all day," and that "it hurts so bad that [she is] completely forced to lay down for days at a time."  (Tr. at 54).  Osborne stated that medication and rest help to control her pain, but added, "I don't feel like I'll ever feel good again."  (Tr. at 55).  In addition, she claimed to be suffering from general muscle pain, which she characterized as continuous aching, burning, and cramping pain.  (Tr. at 58).  As to her depression, Osborne made the following statements:

> Being depressed is the worst part of this—it grabs a hold of me and suffocates me.
> It's uncontrollable.  I know it makes everything worse but I can't stop it.
>
> \*   \*   \*
>
> Medication helps but doesn't ever resolve it.  I don't think I'll feel better about myself until I'm well.

(Tr. at 56-57).

In a supplement to her application, Osborne stated that, on an average day, she does the following:

> Read, rest, some activity when possible such as laundry or making food.  I try to go outside at least one time a day for fresh air.  Listen to music, meditate and pray. Write poetry or write in my journal.  Try to relax because when I stress at all it makes me feel 20 times worse.  Everything spirals down.  Of course if I have a migraine I can do nothing until it ceases—which sometimes takes days.

(Tr. at 65).  She also stated that, since becoming "disabled," she cannot exercise; sometimes cannot "get out of bed"; cannot "go out or do things unless necessary"; takes a long time to get dressed; and sometimes does not have the energy to bathe or brush her teeth.  (Tr. at 65-67).  Plaintiff stated that she has had to call upon her sister to help her bathe on occasion.  (Tr. at 67).  She also stated that she cooks, cleans, and shops for essentials every few days, when possible, but that she gets exhausted easily and can no longer keep the house clean or make the types of meals she used to. (Tr. at 68-71).  Osborne explained that she has trouble sleeping; that she suffers from "night sweats, body aches, swelling, fatigue, pain, [and] waking up constantly"; and that she averages approximately four hours of sleep a night.  (Tr. at 65-67).   Osborne testified that because of her mental condition,  she has lost her friends; that she does not "'feel' like being out most of the time"; and that she is "embarrassed at feeling bad and looking the way [she does]," although she used to be very active socially.  (Tr. at 73-76).  Osborne also stated that she has always been independent and enjoyed working and socializing, and that she would like to recover so that she can work again. (Tr. at 66, 76, 85, 96).  In a supplemental Daily Activity Questionnaire that she submitted with her application for reconsideration, Osborne made the following comments:

> I have been so sick since I have filed that I am unable to get out of bed at all 4 to 5 days a week.  Neighbor & husband have to help me with everything.  The depression has become much worse due to this.  Symptoms to add:  migraine headaches,

20

> swelling, knee & ankle pain, stomach issues, bladder (cystitis), rib cage pain.  When
> I filed I was depressed but that has continually got much worse.

(Tr. at 101).  She also stated that, since filing her last application, she can no longer "do any

cleaning, cooking or writing."  (Tr. at 103).  In one letter to a Social Security official, dated April

17, 2003, Osborne wrote, "My depression is overwhelming and at times I have even considered

suicide due to the burden that I am to my family, friends and the world."  (Tr. at 113).

At the hearing, Osborne spoke to the severity and debilitating effects of the physical and

mental impairments from which she suffered.  (Tr. at 470-80).  She testified that she has a bladder

infection that causes her to have to go to the bathroom approximately 25 to 30 times a day.  (Tr. at

470-71).  She also testified that some of the medications she must take cause nausea, vomiting,

headaches, stomachaches, fatigue, and a loss of concentration.  (Tr. at 472, 477).  Osborne explained

that she suffers from constant pain, and that her biggest problem is with her hands and wrists, which

"ache and burn and swell really bad."  (Tr. at 473).  Those problems also make it very difficult for

her to use a computer.  (Tr. at 474).  Osborne further stated that she gets migraine headaches

approximately three to four times a week, and that they can take up to a day or two to heal.  (Tr. at

478-79).

### Expert Testimony

The ALJ also heard testimony from Herman Litt, a vocational expert.  (Tr. at 480-83).  After

reviewing the records, Mr. Litt characterized Osborne's prior work, as an "office manager," a

"quality assurance engineer . . . [and] lead person in quality assurance," and an "escrow officer," as

sedentary and skilled labor.  (Tr. at 481).  He described her previous work as a carpet cleaner as light

and unskilled labor.  (Id.).  The ALJ then posed a series of hypothetical questions to Mr. Litt to

assess Osborne's residual functional capacity:

Q       Let's say we have an individual who is the same age, education and vocational history as this Claimant, is limited to light work as defined in the [INAUDIBLE] can occasionally lift and carry 20 pounds, frequent [sic] lift and carry 10 pounds; stand and walk with normal breaks about six hours in an eight-hour workday; sit with normal breaks about six hours in an eight-hour workday.  The individual could not constantly use the hands for such tasks--for such repetitive tasks as keyboarding but could use them frequently.  Am I clear in vocational terms?

A       Yes, sir.

Q       Is that going to leave any of the Claimant's past relevant work?

A       Yes, sir.

Q       Which jobs, please?

A       She would be able to do her job as an office manager, escrow officer and I believe those would be the two that we're certain about.

Q       Okay.  Let's say we change the hypothetical and I'm going to add into it what I previously gave you.  And then let's say the individual is also limited to simple repetitive tasks and incidental content [sic] with the public.  By incidental contact with the public, I mean, for example, the kind of contact that a maid who worked in a motel might have, bump into the public but not have to deal with them on a regular basis.  Is that going to eliminate all the Claimant's past relevant work?

A       Yes, sir, it is.

Q       Is it going to leave any other work in the regional or national economy?

A       Yes, sir.

Q       Give me some representative jobs, please.

A       Yes, sir.  There would be some light, unskilled types of jobs that would be available, Your Honor.  Jobs such as office cleaner . . . [and] office helper..

(Tr. at 481-83).  Mr. Litt testified further that a significant number of these jobs exist in the local, regional, and national economies.  (Tr. at 483).  The ALJ then posed one more hypothetical question:

22

Q     . . . Let's say we have an individual who because of the kind of complaints that the Claimant has testified [to] here today wouldn't be able to get through an eight-hour day, five days a week; would have to lay down to the extent she testified and other things she testified to. That's going to eliminate all competitive work?

A     Yes, sir.

(*Id.*). The ALJ gave Plaintiff's counsel the opportunity to question the witness further, but he declined that opportunity. (Tr. at 483-84).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence. From his review of the record, he determined that Osborne suffers from "depression, post traumatic stress disorder, costochrondal pain, carpal tunnel syndrome, a history of migraine headaches, rheumatoid arthritis, and gastro intestinal problems," and that those impairments are "severe." (Tr. at 28). He also found that she had a "history of hemorrhoids, history of a kidney cyst, laporoscopy, history of hysterectomy, and side effects from her medications," but that none of those impairments were "severe." (*Id.*). He concluded that Osborne does not have an impairment, or any combination of impairments, which meet, or equal in severity, the requirements of any applicable SSA Listing. (*Id.*). The ALJ also found that Osborne was unable to return to any of her previous occupations as an office manager, quality assurance engineer and lead person, escrow officer, and carpet cleaner. (Tr. at 26, 28). However, he determined that she does have "the residual functional capacity to perform a significant range of light work" that is available in significant numbers in the local and national economy, including work as an office helper. (Tr. at 28). Ultimately, he concluded that Osborne was not under a "disability," as defined by the Act, through the date of the hearing. (*Id.*).

With that decision, he denied Osborne's application for disability insurance benefits.  (Tr. at 29).

That denial prompted her request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

Plaintiff claims that the ALJ erred because he failed to give proper consideration to her fibromyalgia.  (Plaintiff's Motion at 4).  In his decision, the ALJ stated that "[t]here is a question as to whether the claimant has fibromyalgia, rheumatoid arthritis, or MS."  (Tr. at 24).  He then stated that, because of this "question," he would "list[] rheumatoid arthritis as a severe impairment because it seemed the more solid diagnosis."  (*Id*.).  The effect of this resolution was that the ALJ did not consider fibromyalgia as a separate disorder.  (*See* Tr. at 22-29).  Indeed, in the section of the decision titled "findings," the ALJ does not include fibromyalgia in any finding, whether in his list of Plaintiff's medically determinable impairments, her severe impairments, or her impairments which are not severe.  (*See* Tr. at 27-28).

"Fibromyalgia" is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue."  *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004).  Common symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of

24

pain and fatigue associated with this disease." *Id.* at 589-90 (citing *Brosnahan v. Barnhart*, 336 F.3d

671, 672 n.1 (8th Cir. 2003)).  It has been recognized that the cause of fibromyalgia,

> is unknown, there is no cure, and it is poorly-understood within much of the medical
> community.  The disease is diagnosed entirely on the basis of patients' reports of
> pain and other symptoms.  The American College of Rheumatology issued a set of
> agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to
> confirm the diagnosis.

*Id.* at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004);

*Brosnahan*, 336 F.3d at 672 n.1).  Indeed, in *Benecke*, the court held that the "ALJ erred by

'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'"  *Id.* at

594 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).

Here, the record is replete with evidence that Osborne suffers from fibromyalgia and that

she has been treated for that disorder on a regular basis.  (*See* Tr. at 130-31, 141-42, 243-44, 273,

278, 287, 334, 357).  Of the physicians making that diagnosis, four were Plaintiff's treating

physicians, and one of them—Dr. Sharma—specialized in rheumatology and pain management.  (Tr.

at 141-42 [Dr. Tate]; 243-44 [Dr. Sharma]; 334 [Dr. Baker]; and 357 [a physician at Christus St.

John Hospital]).  Another of Plaintiff's treating physicians, Dr. Payne, who is also a rheumatologist,

did not make a definitive diagnosis, but he did find that her physical impairments were "most

consistent with a fibromyalgia type process."  (Tr. at 130-31).  Further, even physicians who

evaluated Osborne on behalf of the state, namely, Dr. Dolby and Dr. Cline, found that Osborne

suffered from fibromyalgia.  (Tr. at 278, 287).  And Dr. Riddle, who also acted on the state's behalf,

accepted the diagnosis as part of his psychological evaluation.  (Tr. at 273).  Despite this wealth of

evidence, the ALJ did not address Osborne's fibromyalgia as a separate impairment, and he did not

consider its effects, if any, either alone or in combination with her other serious impairments.

Because several of Plaintiff's treating physicians diagnosed her as suffering from fibromyalgia, the ALJ was not free to dismiss their diagnoses without showing that "good cause" existed to do so. *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56.   Under these circumstances, it is clear that the ALJ failed, at step two of his analysis, to properly evaluate the sum of Osborne's conditions.  *See Wren*, 925 F.2d at 125.  This failure indicates that the ALJ did not apply the proper legal standards before reaching his decision.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  For these reasons, a remand is required so that the ALJ can consider Osborne's documented fibromyalgia as a part of his analysis.

Plaintiff also argues that the ALJ erred because he failed to evaluate her severe depression and her post traumatic stress disorder.  (Plaintiff's Motion at 4, 7).  In his decision, the ALJ found that Osborne suffered from depression and PTSD and that both of these impairments are "severe." (Tr. at 24, 28).  The SSA regulations provide for a "special technique" that must be followed "at each level in the administrative review process" when evaluating mental impairments.  20 C.F.R. § 404.1520a(a).  This special procedure is commonly known as the "psychiatric review technique," or "PRT."  *See Boyd v. Apfel*, 239 F.3d 698, 703 (5th Cir. 2001).  Under the PRT, the pertinent symptoms, signs, and laboratory findings are reviewed to determine whether the claimant has a medically determinable mental impairment.  *See* 20 C.F.R. § 404.1520a(b).  Psychiatric signs include abnormalities of behavior, mood, thought, memory, orientation, development, or perception, which are demonstrated by observable facts as described by an appropriate medical source.  *See id.*; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00B.  In addition to the relevant psychiatric signs, the ALJ must rate the functional limitations that result from the mental impairment in four broad areas:  (i)

26

activities of daily living; (ii) social functioning; (iii) concentration, persistence, and pace; and (iv) episodes of decompensation. *See* 20 C.F.R. § 404.1520a(b)(2) & (c)(3). The degree of functional loss must be rated on a five-point scale that ranges from no limitation to an inability to do any gainful work activity. *See id.* at (c)(4). The regulations set out this requirement as follows:

> The written decision issued by the ALJ or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history including examination and laboratory findings . . . that were considered in reaching a conclusion about the severity of the mental impairment. The decision must include a specific finding as to the degree of limitation in each of the functional areas described in [20 C.F.R. §404.1520a(c)].

20 C.F.R. §404.1520a(e)(2).

In this case, while a PRT form was completed on behalf of the state, the ALJ did not discuss it, incorporate it into his decision by reference, or "include [in his decision] a specific finding as to the degree of limitation in each of the functional areas described in [20 C.F.R. §404.1520a(c)]." Nor did he discuss the numerous findings by those who treated Osborne and diagnosed her as suffering from depression and PTSD. (*See* Tr. at 134 [Ms. Biggs]; 158-64 [Ms. Kilgore]; 306-32 [Dr. Buie]; 334 [Dr. Baker]; 335-42, 439-56 [Dr. Atwell]; 408-11 [Dr. White]). Further, he made no mention of Dr. Atwell's detailed findings or of her mental RFC assessment of Osborne, which contradicts, in part, the mental RFC assessments made on the state's behalf. In sum, the ALJ failed to follow agency procedures for considering a claimant's mental impairments and for discounting the opinions of her treating physicians. As a consequence, remand is also warranted so that proper consideration can be made of Osborne's mental impairments.

As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures." *Newton*, 209 F.3d at 459 (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). If an agency "violate[s] its rules and prejudice result[s], the proceedings are

tainted and any actions resulting from the proceeding cannot stand." *Hall*, 660 F.2d at 119.  In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached. *See Ripley*, 67 F.3d at 557.  In this case, it is beyond dispute that the ALJ might have reached a different decision had he properly considered all of Plaintiff's physical and mental impairments, including the findings of her treating physicians. Under these circumstances, it is clear that Plaintiff was prejudiced by the ALJ's errors.  For that reason, it is appropriate to remand her claim so that the ALJ can properly consider the record.  It is therefore recommended that this matter be remanded, under sentence four of 42 U.S.C. 409(g), so that the ALJ can make a decision within the confines of the agency's rules.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.  It is further **RECOMMENDED** that Plaintiff's claim be **REMANDED**, so that the ALJ can give proper consideration to Plaintiff's physical and mental impairments and as to the opinions of her treating physicians.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 27th day of February, 2008.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**